**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| IDEAL INSTRUMENTS, INC., a Michigan corporation, | |
| Plaintiff, | No. C 05-3079-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR SANCTIONS AGAINST DEFENDANTS AND THEIR ATTORNEYS PURSUANT TO FED. R. CIV. P. 11, 28 U.S.C. § 1927, AND/OR THE COURT'S INHERENT AUTHORITY** |
| RIVARD INSTRUMENTS, INC., a foreign corporation, and MERIL RIVARD, a foreign national, | |
| Defendants. | |

_____

**TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A. *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        *1. The parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        *2. Ideal's patents and product* . . . . . . . . . . . . . . . . . . . 4
        *3. The litigation* . . . . . . . . . . . . . . . . . . . . . . . . . 5
        *4. The motion for preliminary injunction* . . . . . . . . . . . . . . 7
        *5. Ideal's "warning shots"* . . . . . . . . . . . . . . . . . . . . . 8
        *6. The hearing on the motion for preliminary injunction* . . . . . 9
        *7. Denial of the motion for preliminary injunction* . . . . . . . . 9
            *a. Pertinent factual findings* . . . . . . . . . . . . . . . 9
            *b. Pertinent legal conclusions* . . . . . . . . . . . . . . 11
    B. *Ideal's Motion For Sanctions* . . . . . . . . . . . . . . . . . . . . . 14

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    A. *Which Circuit's Law Applies?* . . . . . . . . . . . . . . . . . . . . . 16

**B.  Authority And Standards For Sanctions** . . . . . . . . . . . . . . . . . . . . . 17
**C.  Sanctions Under Rule 11** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       **1.  Arguments of the parties** . . . . . . . . . . . . . . . . . . . . . . . 21

           **a.  Ideal's argument** . . . . . . . . . . . . . . . . . . . . . . . . 21

           **b.  Rivard's response** . . . . . . . . . . . . . . . . . . . . . . . . 22

       **2.  Prerequisites to Rule 11 sanctions** . . . . . . . . . . . . . . . . . . 24

           **a.  The "safe harbor" requirements** . . . . . . . . . . . . . . . . 24

           **b.  Right to be heard** . . . . . . . . . . . . . . . . . . . . . . . . 30

           **c.  Parties potentially subject to sanctions** . . . . . . . . . . . 31

       **3.  Sanctionable conduct under Rule 11** . . . . . . . . . . . . . . . . . 31

           **a.  Lack of evidentiary support** . . . . . . . . . . . . . . . . . . 33

               **i.  Applicable standards** . . . . . . . . . . . . . . . . . 33

               **ii.  Reasonableness of reliance on Dr. Hoff's testing** . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

               **iii.  Reasonableness of reliance on metallurgical testing** . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

           **b.  Improper purpose** . . . . . . . . . . . . . . . . . . . . . . . . 40

               **i.  Applicable standards** . . . . . . . . . . . . . . . . . 40

               **ii.  Inferences of improper purposes** . . . . . . . . . . 42

       **4.  The appropriate sanctions** . . . . . . . . . . . . . . . . . . . . . . . 43

           **a.  Applicable standards** . . . . . . . . . . . . . . . . . . . . . . 43

           **b.  The sanction warranted here** . . . . . . . . . . . . . . . . . 45

**D.  Other Sanctions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

**III.  CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Was the defendants' motion for preliminary injunction in this case unreasonable and in bad faith, or just wholly unpersuasive? The plaintiff has moved for sanctions against the defendants and their attorneys pursuant to Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and/or the court's inherent authority for filing their motion for preliminary injunction, which asserted that the plaintiff

2

was committing false advertising and threatening public safety by selling patented "detectable" hypodermic needles for use on livestock that are not actually "detectable" within the meaning of the meat processing, veterinary, and detectable needle industries. The plaintiff contends that the court's determination that *none* of the pertinent factors weighed in favor of granting the defendants' motion for preliminary injunction demonstrates that the defendants' motion was a frivolous and costly distraction from the real patent infringement issues in the case, as the plaintiff had always maintained. Notwithstanding the court's denial of their motion for preliminary injunction, the defendants contend that they reasonably believed that they had evidentiary support for their motion and that the motion was not filed for any improper purpose.

## I. INTRODUCTION

This ruling on the plaintiff's motion for sanctions is, in fact, the fourth substantial ruling in this case. *See Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 434 F. Supp. 2d 589 (N.D. Iowa 2006) (*Ideal Instruments I*) (ruling on defendants' challenges to the forum in which various claims should be litigated and personal jurisdiction over the individual defendant); *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 434 F. Supp. 2d 640 (N.D. Iowa 2006) (*Ideal Instruments II*) (ruling on motion to reconsider and to stay); *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 479 F. Supp. 2d 968 (N.D. Iowa 2007) (*Ideal Instruments III*) (ruling on the defendants' motion for preliminary injunction based on the defendants' false advertising counterclaim pursuant to § 43 of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B)). Nevertheless, a statement of the background to the issues presented in the motion for sanctions is required.

3

## A. Background

### 1. The parties

Plaintiff Ideal Instruments, Inc., (Ideal) is a Michigan corporation with its principal place of business in Lansing, Michigan.[1] Defendant Rivard Instruments, Inc., (Rivard) is a closely held for-profit Canadian corporation, and defendant Meril Rivard, who is a citizen of Canada and resident of Winnipeg, Manitoba, is the president and majority, if not sole, shareholder of Rivard Instruments. Both Ideal and Rivard manufacture "detectable" hypodermic needles for use, for example, in hypodermic syringes for livestock. The needles are "detectable" in the sense that they are made to be easily detected in the carcasses of slaughtered animals using metal detectors installed in meat processing plants, if the needles break off or are otherwise inadvertently left behind in the course of injecting the animals.

### 2. Ideal's patents and product

Two of Ideal's patents are at issue in this lawsuit. Ideal is the assignee of United States Patent No. 6,488,668 (the '668 patent) for a "detectable heavy duty needle." The inventor of the '668 patent is identified as Gordon Prindle, and the patent stems from application number 08/714,041, filed November 16, 2000. The '668 patent originally issued on December 3, 2002, and was upheld on *ex parte* reexamination on December 23, 2004. Ideal is also the assignee of another patent for a "detectable heavy duty needle," United States Patent No. 6,960,196 (the '196 patent), which also identifies the inventor as Gordon Prindle, and stems from application number 10/215,122, filed on August 8, 2002, as a continuation of the application that ripened into the '668 patent. The '196 patent issued on November 1, 2005.

---

[1]For present purposes, the court will not distinguish between Ideal and its parent company, Neogen Corporation.

4

Ideal manufactures, sells, and distributes a product exploiting the inventions disclosed in the '668 and '196 patents under the commercial name "D3 Detectable Needles." As the court found in its ruling on Rivard's motion for preliminary injunction, the packaging for Ideal's D3 needles clearly identifies the needles as "sterile detectable needles with metal hubs," as "detectable hypodermic needles," as "detectable needles," and as "for veterinary use only." Ideal has also disseminated marketing literature that describes D3 needles as having "superior detectability," as having been "found to be 100% detectable" under specified test conditions, and as made from a "detectable alloy" or "patented alloy" that allows them to be "as much as 100% detectable." Ideal has sold many millions of D3 needles in the last six years without a single reported incident of a D3 needle breaking, passing undetected through a metal detector, and finding its way into a consumer's food.

### 3.    *The litigation*

Ideal filed the present lawsuit on December 30, 2005. In its original Complaint, Ideal asserted claims of infringement by Rivard Instruments and Meril Rivard of Ideal's '196 patent for "detectable" hypodermic needles for livestock, non-infringement by Ideal of the defendants' Canadian patent for a similar device, and various commercial torts. By order dated May 8, 2006, the court dismissed Ideal's claim of non-infringement of Rivard's Canadian patent for lack of subject matter jurisdiction, but otherwise denied Rivard's motion to dismiss. *See Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 434 F. Supp. 2d 598 (N.D. Iowa 2006) (*Ideal Instruments I*). By order dated June 21, 2006, the court granted Ideal's motion to amend its Complaint and granted Rivard's motion to stay proceedings to the extent that the court stayed Ideal's claims of defamation and tortious interference with business relations pending resolution of litigation in Canada concerning the validity and infringement of Rivard's Canadian patent. *See Ideal*

5

*Instruments, Inc. v. Rivard Instruments, Inc.*, 434 F. Supp. 2d 640 (N.D. Iowa 2006) (*Ideal Instruments II*).

Ideal filed further amended complaints, so that the operative document is now Ideal's Third Amended Complaint filed December 29, 2006 (docket no. 122). The claims in Ideal's Third Amended Complaint, at least those that are before the court and not stayed, are the following: infringement by Rivard Instruments of Ideal's '668 patent in Count I; infringement, including inducing infringement, by Meril Rivard of Ideal's '668 patent in Count II; infringement by Rivard Instruments of Ideal's '196 patent in Count III; infringement, including inducing infringement, by Meril Rivard of Ideal's '196 patent in Count IV; and product disparagement or trade libel by both defendants in Count VI.

Rivard filed its Answer (docket no. 129) to Ideal's Third Amended Complaint on January 16, 2007, denying Ideal's claims and asserting numerous affirmative defenses and counterclaims. Of interest here is Rivard's Eighth Counterclaim, which asserts a "false descriptions" form of "false advertising" in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). That counterclaim alleges, in essence, that Ideal advertises its D3 needles as "detectable," but such needles are not sufficiently detectable as understood in the detectable hypodermic needle and meat processing industries, so that Ideal's representations constitute false statements of fact.[2] Ideal denies all of Rivard's counterclaims. *See* Plaintiff's Answer And Affirmative Defenses To Second Amended Counterclaims filed February 5, 2007 (docket no. 142).

---

[2]This counterclaim includes allegations of other false statements in Ideal's advertising of its D3 needles, but those allegations were not material to the defendants' motion for preliminary injunction.

6

## 4.    *The motion for preliminary injunction*

Rivard filed the original version of its Motion For Preliminary Injunction on October 30, 2006 (docket no. 85), seeking to enjoin Ideal from violating the false advertising provisions of § 43 of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B), by selling patented "detectable" hypodermic needles for livestock that are not actually "detectable," as the defendants alleged in their Eighth Counterclaim.[3] More specifically, Rivard sought an order preliminarily enjoining Ideal from selling its "detectable" needles and also enjoining Ideal to recall all such needles in the interest of public safety. Rivard's motion for preliminary injunction, at least initially, relied exclusively on the results of testing of Ideal's D3 needles by its expert, Dr. Hoff, conducted at the defendants' request in October 2006.

Rivard filed various supplements to its motion on November 28, 2006 (docket no. 105), December 12, 2006 (docket no. 115), and February 2, 2007 (docket no. 140). More specifically, the November 28, 2006, supplement incorporated results of further testing by Dr. Hoff, undertaken on his own initiative in November 2006; the December 12, 2006, supplement asserted new arguments about Ideal's failure to use metal detectors to verify detectability of its products and purported problems with Ideal's products; and the February 2, 2007, supplement asserted that new metallurgical testing of Ideal's needles by the defendants' metallurgy expert revealed that Ideal's needles were sometimes made with a type of stainless steel that Ideal had considered unsuitable for "detectable" needles.

Ideal filed a comprehensive Opposition (docket no.153) to Rivard's motion for preliminary injunction, as repeatedly supplemented, on March 7, 2007. Rivard filed a Reply (docket no. 154) on March 9, 2007. On March 10, 2007, Ideal filed two further

---

[3]Individual defendant Meril Rivard was not identified as a movant on the motion for preliminary injunction.

Case 3:05-cv-03079-MWB    Document 197    Filed 07/03/07    Page 7 of 50

declarations (docket no. 155) in response to what Ideal contended were "new" arguments in Rivard's Reply.

### 5. Ideal's "warning shots"

Not only did Ideal strenuously resist Rivard's various attempts to supplement its Motion For Preliminary Injunction and the motion itself, as ultimately framed, Ideal also fired various "warning shots" at Rivard urging Rivard to withdraw its Motion For Preliminary Injunction or face a motion for sanctions. First, in a letter dated October 30, 2006, in response to a request from Rivard that Ideal simply stipulate to a preliminary injunction, Ideal's counsel informed counsel for Rivard in pertinent part, "from what we know and from what have [sic] already filed with the court, such a motion for a preliminary injunction would appear to raise the specter of Rule 11 and 28 U.S.C. § 1927." Plaintiff's Combined Motion And Brief In Support Of Motion For Sanctions Against Defendants And Their Attorneys Pursuant To F.R. Civ. P. 11, 28 U.S.C. § 1927, and/or This Court's Inherent Authority (docket no. 165), Exhibit 1 (Plaintiff's Sanctions Exhibit 1) at page 3. On November 14, 2006, Ideal's counsel sent counsel for Rivard a cover letter and draft Motion For Imposition Of Sanctions Pursuant To F.R. Civ. P. 11, 28 U.S.C. § 1927, and/or the Court's Inherent Authority. Plaintiff's Sanctions Exhibits 2 (cover letter) and 3 (November 14, 2006, draft motion). By e-mail dated December 9, 2006, Ideal's counsel e-mailed Rivard's counsel a message in which Ideal's counsel, *inter alia*, reminded Rivard's counsel that Rivard's 21-day "safe harbor" under Rule 11 to withdraw its Motion For Preliminary Injunction without consequences had expired. Plaintiff's Sanctions Exhibit 4. The letter added, however, that Rivard still had the opportunity to mitigate the amount of fees and expenses that Rivard and/or its attorneys might ultimately be required to pay if Rivard would withdraw its Motion For Preliminary

Injunction.  Plaintiff's Sanctions Exhibit 4.  Rivard went forward with prosecution of its Motion For Preliminary Injunction despite these "warning shots."

> **6.  The hearing on the motion for preliminary injunction**

After various delays caused by Rivard's supplementation of its Motion For Preliminary Injunction and discovery and other disputes related to that motion, Rivard's Motion For Preliminary Injunction eventually came on for hearing on March 13, 2007. Although the parties had submitted copious exhibits in support of and resistance to Rivard's Motion For Preliminary Injunction and its various supplements, neither party appeared with witnesses to establish the necessary foundation for those exhibits at the March 13, 2007, hearing on the Motion For Preliminary Injunction.  Thus, much of the time set aside for the hearing was actually occupied with the parties' attempts to reach various stipulations on the admissibility of certain exhibits.  Once such stipulations were reached, the parties agreed to submit to the court a unified set of exhibits within the next two business days.  The court then heard arguments from both sides.  The parties agreed that no further briefing would be required, once the court received the unified set of exhibits.

The logistical problems involved in assembling a unified set of exhibits exceeded the parties' expectations.  Therefore, the court received the parties' Stipulated Exhibits Regarding Rivard's Motion For Preliminary Injunction And Ideal's Brief In Opposition To Same (Stipulated Exhibits) on March 19, 2007.  With the receipt of the Stipulated Exhibits, Rivard's Motion For Preliminary Injunction was, at long last, fully submitted.

> **7.  Denial of the motion for preliminary injunction**
>> **a.  Pertinent factual findings**

On March 28, 2007, the court filed a ruling denying Rivard's Motion For Preliminary Injunction as repeatedly supplemented.  *See Ideal Instruments, Inc. v. Rivard*

*Instruments, Inc.*, 479 F. Supp. 2d 968 (N.D. Iowa 2007) (*Ideal Instruments III*). In that ruling, the court found, *inter alia*, that a 55% failure rate for what are supposed to be "detectable" needles, as found in Dr. Hoff's October 2006 tests, would be "frightening." *Ideal Instruments III*, 479 F. Supp. 2d at 977. Nevertheless, the court found that Dr. Hoff's testing in October 2006, on which Rivard's Motion For Preliminary Injunction had originally been based, "has no probative value whatsoever concerning the 'detectability' of Ideal's D3 needles within the meaning of the livestock and meat processing industries owing to the flawed procedures that bore no relationship to industry conditions or the conditions of prior tests commissioned by the [National Pork Board (NPB)]." *Id.* Similarly, the court found that Dr. Hoff's supplemental testing in November 2006 "does not support a conclusion that Ideal's D3 needles are not 'detectable.'" *Id.* at 978.

In contrast, the court made these findings about other testing of Ideal's D3 needles in December 2006 and the court's ultimate finding on the "detectability" of those needles:

> Unlike the "detectability" tests by Dr. Hoff in October and November 2006, the court finds that Ideal's December 2006 tests are probative of whether or not Ideal's D3 needles are "detectable" within the meaning of the livestock and meat processing industries and that such tests demonstrate that the needles are, in fact, "detectable" within the meaning of those industries. Ideal's December 2006 tests, like Dr. Hoff's independent tests for the NPB in 2000-2001 and Dr. Hoff's tests commissioned by Ideal in 2002 and 2006, used valid samples and procedures to determine "detectability" of needles in conditions realistically approximating conditions in meat processing plants. Moreover, in light of the lack of probative value of Dr. Hoff's October 2006 tests and the probative value of the "detectability" tests commissioned by Ideal, the court finds that Ideal's D3 needles are "detectable" within the meaning of the livestock and meat processing industries.

Case 3:05-cv-03079-MWB   Document 197   Filed 07/03/07   Page 10 of 50

*Id.* at 979-80.

As to the "wrong steel" dispute raised as Rivard's last ground for preliminary injunctive relief, the court found as follows:

> At the hearing, Rivard attempted to correlate metallurgical tests with Dr. Hoff's tests in October and November 2006 to demonstrate that D3 needles that produced poor signals in metal detector tests were made from type 304 stainless steel. Even if there is such a correlation, however, for the reasons stated above, Dr. Hoff's October 2006 tests have no probative value on "detectability," so a significant point of reference is lacking. Moreover, as Ideal points out, Dr. Hoff has admitted that needles made from type 304 stainless steel are detectable, and metallurgy tests reveal that Rivard also makes or made some of its "detectable" needles from type 304 stainless steel. Ideal has also submitted the affidavit of Terri Morrical, a Vice President of Ideal's parent company, Neogen, averring that, when Ideal learned from Rivard's tests that some of Ideal's D3 needles are made from type 304 stainless steel, not a duplex steel as required by the specifications to Ideal's manufacturer, out of an abundance of caution, she quarantined all remaining D3 needles from affected lots, and none of those quarantined needles have ever been sold or distributed. Plaintiff's Exhibit 34. Thus, there is no convincing evidence that the use of the "wrong" stainless steel alloy in some of Ideal's D3 needles resulted in needles that were not "detectable" or that were a danger to the public.

*Id.* at 981.

### b. *Pertinent legal conclusions*

In its legal analysis, the court noted that, in this Circuit, preliminary injunctions and temporary restraining orders are generally measured against the following "*Dataphase* factors": (1) the movant's probability of success on the merits, (2) the threat of irreparable harm to the movant absent the injunction, (3) the balance between the harm and the injury

11

that the injunction's issuance would inflict on other interested parties, and (4) the public interest. *Id.* at 983 (citing *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*)). Applying these *Dataphase* factors, the court found that a preliminary injunction was not warranted on any of the grounds asserted by Rivard.

As to "likelihood of success on the merits," the first *Dataphase* factor, the court concluded that "Rivard has little or no chance of proving the 'literal falsity' element of its 'false advertising' claim under § 43(a) of the Lanham Act," that "the lack of any convincing evidence on three of the five elements of Rivard's 'false advertising' claim—false representation, deception, and injury to claimant—means that Rivard has little or no likelihood of success on such a claim under governing law, and such limited likelihood of success clearly does not support the sweeping preliminary injunctive relief Rivard seeks." *Id.* at 989-90. This conclusion was based on the court's findings (1) that the word "detectable" on Ideal's packaging meant that the needles so labeled will be detected in animal carcasses by metal detectors routinely used in the meat processing industry, and that Ideal's testing, and even the deposition testimony of Rivard's expert, Dr. Hoff, supported the conclusion that Ideal's D3 needles are, indeed, "detectable"; (2) that Dr. Hoff's testing for Rivard in October 2006 has no probative value whatsoever concerning the "detectability" of Ideal's D3 needles within the meaning of the livestock and meat processing industries; (3) that Dr. Hoff's November 2006 testing simply does not demonstrate that the D3 needles are not "detectable"; (4) that there is no anecdotal evidence of any—let alone any frequent or recurrent—instances in which D3 needles have passed undetected through a metal detector, and found their way into a consumer's food; and (5) that the evidence showed that Ideal is now taking reasonable measures—including use of industry standard metal detectors and metallurgical testing—to ensure that all D3 needles are actually detectable and made from specified alloys. *Id.* at 989.

12

Furthermore, the court found that "even though Rivard has also failed to prove likelihood of success on the merits, denial of injunctive relief would be justified solely by Rivard's failure to demonstrate irreparable harm," the second *Dataphase* factor. *Id.* at 992. This court concluded that, "where there has been no convincing proof of false advertising, there is no likelihood of harm, let alone irreparable harm, to a competitor from that alleged false advertising that would justify a preliminary injunction on the sale of the products in question or a preliminary injunction requiring the recall of such products." *Id.*

The court also found that the "balance of harms" *Dataphase* factor "weighs decidedly against granting Rivard the relief that it seeks," for the following reasons:

> Here, as explained above, Rivard's harm is so unlikely as to be illusory, so that it has little or no weight in the calculus. On the other hand, the potential economic harm to Ideal of a preliminary injunction of the breadth that Rivard seeks would be substantial, if not huge, because of its deleterious effect not only on Ideal's immediate business, but because of the lasting harm to its reputation with no offsetting justified economic benefit to Rivard, only an unjustified windfall. Moreover, as the court has repeatedly pointed out, whatever potential for harm might have existed has been substantially reduced by Ideal's recent remedial actions to ensure that all of its "detectable" needles are tested for "detectability" using an industry standard metal detector and regular metallurgical testing to ensure that the specified alloys of steel are used in the actual manufacturing of the D3 needles. Even imagining, contrary to all of the evidence showing that no D3 needles have ever passed through the meat processing system to arrive on the plate of a consumer, that there was some past misconduct—in the form of lax production standards that allowed needles of questionable "detectability" or made of the "wrong" alloy to reach the market—there is no showing of a present harm from such past misconduct requiring some

13

> additional corrective action, because such relief goes beyond the purpose of a preliminary injunction. Indeed, the lack of any evidence that isolated reports of problems in the field resulted in any harm to the public, the livestock industry, or the meat processing industry, and the lack of any evidence that actions by Ideal did not prevent any such harm, demonstrates that there is presently no public health risk requiring a recall of any of Ideal's D3 needles or a prohibition on any sales of such needles. Ultimately, this is another Lanham Act case in which the movant has failed to demonstrate a probability of ultimate success, so that the possibility that it will suffer any harm from the continuing use by the non-movant of its challenged advertising is highly speculative and therefore does not serve to tip the balance of equities in [Rivard's] favor.

*Ideal Instruments III*, 479 F. Supp. 2d at 993-94 (internal quotation marks and citations omitted). Similarly, the court found that the last *Dataphase* factor, "the public interest," did not weigh in favor of a preliminary injunction, where the public interest would not be served, because the court had found no false statements or safety risks from allegedly false labeling to be enjoined. *Id.* at 994.

Because none of the *Dataphase* factors weighed in favor of granting the preliminary injunctive relief that Rivard sought, the court denied Rivard's Motion For Preliminary Injunction. *Id.*

### B. Ideal's Motion For Sanctions

On April 20, 2007, Ideal filed its Combined Motion And Brief In Support Of Motion For Sanctions Against Defendants And Their Attorneys Pursuant To F.R. Civ. P. 11, 28 U.S.C. § 1927, and/or This Court's Inherent Authority (Ideal's Motion For Sanctions) (docket no. 165), seeking sanctions against Rivard and its attorneys for filing and maintaining Rivard's Motion For Preliminary Injunction. Ideal's grounds for

sanctions are essentially the following: (1) sanctions under Rule 11 of the Federal Rules of Civil Procedure are warranted, because the court's ruling on Rivard's Motion For Preliminary Injunction can only lead to the conclusion that Rivard and its counsel violated the "objective reasonableness" standard of Rule 11 by moving for a preliminary injunction without conducting a reasonable inquiry, then maintained that motion despite the lack of any credible evidence to support it; (2) sanctions under 28 U.S.C. § 1927 are warranted, because Rivard's counsel acted recklessly, in bad faith, and with improper motives, and thereby multiplied the proceedings unreasonably and vexatiously, by filing and maintaining the Motion For Preliminary Injunction knowing that Rivard had no evidence to support its argument that Ideal's D3 needles were not "detectable"; and (3) sanctions under the court's inherent authority are warranted, because Rivard's Motion For Preliminary Injunction was filed in bad faith and disingenuously in light of evidence known to Rivard.

On May 8, 2007, Rivard filed its Memorandum In Opposition To Ideal's Motion For Sanctions (Rivard's Opposition) (docket no. 178). Based on a sweeping review of evidence, including opinions of two experts, Dr. Hoff and a metallurgist, Rivard contends that it and its counsel reasonably believed that the validity of Ideal's patents was seriously undermined and that *some portion* of Ideal's D3 needles were not "detectable" within the meaning of the meat processing and detectable needle industries. Rivard also contends that, based on its Motion For Preliminary Injunction, Ideal implemented numerous corrective actions, which the court then found undermined the need for preliminary injunctive relief. Thus, Rivard contends that Ideal's Motion For Sanctions is based on the erroneous notion that there was no evidence to support Rivard's Motion For Preliminary Injunction and on significant erroneous characterizations of Rivard's motion, Rivard, and Rivard's counsel.

On May 8, 2007, the same day that Rivard filed is Opposition, Ideal filed a Reply (docket no. 179), characterizing Rivard's Opposition as laden with half-truths, out-of-context and misleading statements, misrepresentations, and *ad hominem* arguments directed at Ideal, its parent company, and past and present attorneys with the firm now representing Ideal. In essence, however, Ideal's Reply was that "[t]he lady doth protest too much, me thinks." Ideal's Reply (docket no. 179) at 3 (quoting William Shakespeare, *Hamlet* (III, ii, 239)).

The court held oral arguments on Ideal's Motion For Sanctions on June 28, 2007. At that oral arguments, plaintiff Ideal was represented by Mark R. Fox of Harris of Fraser, Trebilcock, Davis & Dunlap, P.C., in Lansing, Michigan. Defendants Rivard Instruments and Meril Rivard were represented by Terence J. Linn and Karl T. Ondersma of Van Dyke, Gardner, Linn & Burkhart, L.L.P., in Grand Rapids, Michigan, both of whom offered arguments on behalf of the defendants and their counsel, and local counsel Angela E. Dralle of Dorsey & Whitney, L.L.P., in Des Moines, Iowa.

Ideal's Motion For Sanctions is now fully submitted.


## II. LEGAL ANALYSIS

### A. Which Circuit's Law Applies?

Even in litigation, such as patent litigation, that falls within the exclusive appellate jurisdiction of the Federal Circuit Court of Appeals, questions of whether or not to impose sanctions pursuant to Rule 11, 28 U.S.C. § 1927, or the court's inherent authority are resolved by application of the law of the regional circuit. *See, e.g., Intamin, Ltd. v. Magnetar Techs. Corp.*, 483 F.3d 1328, 1337 (Fed. Cir. 2007) (Rule 11 sanctions); *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1141 (Fed. Cir. 2005) (§ 1927 sanctions); *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1288 (Fed. Cir. 2000)

16

(sanctions based on inherent authority). Therefore, the court will consider the standards for imposition of sanctions as articulated by the Eighth Circuit Court of Appeals.

### B. Authority And Standards For Sanctions

Ideal seeks sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and/or the court's inherent authority. As the Eighth Circuit Court of Appeals recently explained, "The source of authority and basis for the sanctions is critical because while Rule 11 and § 1927 overlap to some extent, they sanction different kinds of actions, require the application of disparate standards of proof, permit the sanctioning of different persons, and differ in the procedures that the sanctioning court must follow." *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 623 (8th Cir. 2004); *accord Willhite v. Collins*, 459 F.3d 866, 870 (8th Cir. 2006) (citing *Fuqua Homes*). Thus, the court must explore, at least briefly, the authority to impose sanctions provided by Rule 11, § 1927, and inherent power.

A violation of Rule 11 occurs when a pleading is presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation, FED. R. CIV. P. 11(b)(1), contains claims or contentions not warranted by existing law or by a nonfrivolous argument for extension or reversal of existing law, FED. R. CIV. P. 11(b)(2), contains allegations or factual contentions that lack evidentiary support, FED. R. CIV. P. 11(b)(3), or contains denials of factual contentions that are not warranted on the evidence, FED. R. CIV. P. 11(b)(4). *See also Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004, 1008 (8th Cir. 2006) (so characterizing the provisions of FED. R. CIV. P. 11(b)(1), (3), and (4)). Rule 11 expressly does *not* apply to disclosures and discovery requests or responses subject to Rules 27 through 37. FED. R. CIV. P. 11(d). Rule 11 also provides for differing procedures, depending upon whether the court is

Case 3:05-cv-03079-MWB   Document 197   Filed 07/03/07   Page 17 of 50

considering sanctions on a party's motion, *see* FED. R. CIV. P. 11(c)(1)(A), or *sua sponte*, *see* FED. R. CIV. P. 11(c)(1)(B). Upon a party's motion, if the court determines that sanctions are warranted for an opposing party's filing of a substantive motion, "the court may award to the party prevailing on the [substantive] motion the reasonable expenses and attorney's fees incurred in presenting or opposing the [substantive] motion," and "[a]bsent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees." FED. R. CIV. P. 11(c)(1)(A). The standard for imposition of Rule 11 sanctions is generally that the conduct of the party or its counsel was "objectively unreasonable." *See Clark*, 460 F.3d at 1010; *Norsyn, Inc. v. Desai*, 351 F.3d 825, 831 (8th Cir. 2003). Consequently, appellate courts "'give "[d]eference to the determination of courts on the front lines of litigation" because these courts are "best acquainted with the local bar's litigation practices and thus best situated to determine when a sanction is warranted."'" *Id.* (quoting *MHC Inv. Co. v. Racom Corp.*, 323 F.3d 620, 623 (8th Cir. 2003), in turn quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 404 (1990)). Rule 11 permits sanctions to be imposed "upon *the attorneys, law firms, or parties* that have violated" its provisions. FED. R. CIV. P. 11(c) (emphasis added).

Section 1927 of Title 28 of the United States Code, on the other hand, authorizes a court to "require *counsel* to satisfy personally attorneys' fees reasonably incurred by an opposing party when counsel's conduct 'multiplies the proceedings in any case unreasonably and vexatiously.'" *Clark*, 460 F.3d at 1011 (emphasis added) (quoting § 1927). The court may impose such a sanction, however, only "when an attorney's conduct, 'viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court.'" *Id.* (quoting *Tenkku v. Normandy Bank*, 348 F.3d 737, 743 (8th Cir. 2003), in turn quoting *Perkins v. Spivey*, 911 F.2d 22, 36 (8th Cir. 1990)).

18

Federal courts also have the inherent power to assess attorney fees against *a party or attorney* "'as a sanction for bad faith conduct.'" *Gas Aggregation Servs., Inc. v. Howard Avista Energy, L.L.C.*, 458 F.3d 733, 739 (8th Cir. 2006) (quoting *Lamb Eng'g & Constr. Co. v. Nebraska Pub. Power Dist.*, 103 F.3d 1422, 1435 (8th Cir. 1997)); *see also Willhite*, 459 F.3d at 870 (assuming that the court had used its inherent power to sanction an attorney, noting that "an award of attorneys' fees is permissible under a court's inherent powers as long as the person being sanctioned has demonstrated bad faith"); *United States v. Gonzalez-Lopez*, 403 F.3d 558, 564 (8th Cir. 2005) (the court has the inherent power to sanction a party that has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons'") (quoting *Kelly v. Golden*, 352 F.3d 344, 352 (8th Cir. 2003), in turn quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)). A finding of "bad faith" is specifically required in order to assess attorneys fees pursuant to the court's inherent authority. *Id.*; *accord Willhite*, 459 F.3d at 870. The court's inherent power to sanction conduct "reaches conduct both before and during litigation as long as the conduct abuses the judicial process in some manner." *Id.* Thus, "'[t]his inherent power is similar to the court's other powers to impose sanctions, but it is both broader in that it may reach more litigation abuses and narrower in that it may only be for attorney's fees.'" *Gonzalez-Lopez*, 403 F.3d at 564 (quoting *Kelly*, 352 F.3d at 352). There are certain limitations or requirements before the court may exercise its inherent authority to sanction a party or attorney:

> Because of the potency of inherent powers, "[a] court must exercise its inherent powers with restraint and discretion, and a primary aspect of that discretion is the ability to fashion an appropriate sanction." *Harlan v. Lewis,* 982 F.2d 1255, 1262 (8th Cir. 1993) (citing *Chambers,* 501 U.S. at 44-45, 111 S. Ct. 2123). Furthermore, in invoking its inherent power, a court "must comply with the mandates of due process."

19

> *Chambers,* 501 U.S. at 50, 111 S. Ct. 2123. Thus, before a
> district court may impose sanctions, the individual must
> receive notice that sanctions against her are being considered
> and an opportunity to be heard. *In re Clark,* 223 F.3d 859,
> 864 (8th Cir. 2000) (citing *Chambers,* 501 U.S. at 56-57, 111
> S. Ct. 2123; *Jensen v. Fed. Land Bank of Omaha,* 882 F.2d
> 340, 341 (8th Cir. 1989)).

*Plaintiffs' Baycol Steering Committee v. Bayer Corp.*, 419 F.3d 794, 802 (8th Cir. 2005).

Owing to these differing standards and the differing parties and conduct sanctionable, depending upon the source of the court's authority to impose sanctions, the Eighth Circuit Court of Appeals encourages district courts to state the authority for each sanction imposed. *Willhite*, 459 F.3d at 870; *see also Fuqua Homes, Inc.*, 388 F.3d at 623 (remanding for failure to identify the source of authority for the sanctions imposed). Whatever the authority on which sanctions are sought or imposed, however, a district court's decision regarding imposition of sanctions is reviewed for abuse of discretion. *See Allen v. Tobacco Superstores, Inc.*, 475 F.3d 931, 936 (8th Cir. 2007) (sanctions pursuant to the court's inherent powers or Rule 37 of the Federal Rules of Civil Procedure); *Clark*, 460 F.3d at 1008 & 1011 (sanctions pursuant to Rule 11 and § 1027); *Gas Aggregation Servs., Inc.*, 458 F.3d at 739 (sanctions pursuant to the court's inherent power). Such deferential review applies to the district court's "'decision to impose a sanction, the nature of the sanction imposed, and the factual basis for the court's decision.'" *Allen*, 475 F.3d at 936 (quoting *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1019 (8th Cir. 1999)).

## C. Sanctions Under Rule 11

Ideal, first, seeks sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. The court will begin its analysis of whether or not to impose sanctions

pursuant to Rule 11 by summarizing the parties' arguments for and against imposition of such sanctions.

### 1. Arguments of the parties

#### a. Ideal's argument

In support of its argument for Rule 11 sanctions, Ideal contends that Rivard's Motion For Preliminary Injunction violated subsection (b)(1) of the Rule, in that it was filed for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation, and subsection (b)(3), in that the allegations in the Motion For Preliminary Injunction lacked evidentiary support. Pursuant to Rule 11(c)(2), Ideal seeks some or all of its reasonable attorneys' fees and other expenses incurred as a result of these violations.

More specifically, Ideal argues that Rivard lacked any objectively reasonable basis for its Motion For Preliminary Injunction and that Rivard would have realized the evidentiary insufficiency of its motion if it had conducted a reasonable investigation. Ideal argues that the court's determination that none of the *Dataphase* factors weighed in favor of a preliminary injunction demonstrates that Rivard made no reasonable inquiry before filing its motion, then maintained the motion despite the lack of any credible evidence to support it, even after the insufficiency of its evidence became clear. Ideal contends that all of the evidence known to Rivard, in fact, undermined Rivard's allegations, where Rivard had copies of Dr. Hoff's earlier, independent testing of Ideal's D3 needles and his prior findings that those needles were "clearly 100% detectable"; Rivard knew that Dr. Hoff's October 2006 tests were performed using entirely different test procedures and protocols and that those tests did not replicate field conditions, let alone meet the standards for peer review or statistical significance; and Rivard knew that there were no known incidents of a broken and undetected D3 needle reaching a consumer. Ideal also points out

Case 3:05-cv-03079-MWB   Document 197   Filed 07/03/07   Page 21 of 50

that Rivard was aware that Dr. Hoff had to be deposed three times after the filing of his report on the October 2006 tests and that Rivard fought each and every redeposition, which unnecessarily increased the cost of the litigation, even though Rivard knew that the depositions revealed that Dr. Hoff's October and November 2006 reports were wholly unreliable. Ideal asserts that, viewed objectively, it is apparent that Rivard's intent was to force Ideal either to yield its position or be crushed under the weight of misstated facts and drowned in bombast. Such conduct, Ideal argues, warrants imposition of sanctions pursuant to Rule 11.

### b. *Rivard's response*

Contrary to Ideal's contentions, Rivard asserts that its decisions to file its Motion For Preliminary Injunction and its various supplements to that motion were objectively reasonable and based upon reasonable inquiry, even if the court ultimately rejected the motion, as supplemented. Rivard argues that it reasonably relied on several items of favorable evidence, including the opinions of two experts and what it understood to be the basis for Ideal's patents in light of the inventor's representations about what types of steel were or were not "detectable."

Somewhat more specifically, Rivard contends that it was objectively reasonable for it to rely on the following: (1) testing by *the* expert in the field, Dr. Hoff, showing that certain lots of Ideal's D3 needles were insufficiently detectable, on a par only with conventional Monoject brand needles made from type 304 stainless steel and not marketed as "detectable"; (2) proof that those lots of needles with poor detectability were made from prior art conventional type 304 stainless steel, which is not the stainless steel specified by Ideal for its D3 needles; and (3) recognition in the industry, as reflected in representations in Ideal's own patents, that conventional needles are not sufficiently detectable. Rivard also argues that Dr. Hoff established the protocols and procedures for his tests, and it was

22

objectively reasonable for Rivard to rely on his testing, where he was the acknowledged expert in the field of detectability testing. Rivard also highlights two parts of its argument as demonstrating the reasonableness of its preliminary injunction motion, its contention that Dr. Hoff distinguished between "detection" and "rejection" of needles and its contention that the metallurgical evidence *supported and explained* Dr. Hoff's evidence, not that it provided a *different ground* for injunctive relief. Rivard also contends that it was not arguing that *all* D3 needles are insufficiently detectable, only that *certain lots* of D3 needles were undetectable, and that even one undetectable needle, advertised as detectable but capable of passing through the food processing chain to an end consumer, posed a significant threat of injury to the meat processing and detectable needle industries, to Rivard, and to the public. Rivard also argues that Ideal's corrective measures, upon which the court in part relied in denying the Motion For Preliminary Injunction, were the result of its motion.

As to the manner in which the Motion For Preliminary Injunction was litigated, Rivard contends that the motion was ultimately decided on evidence made of record. In addition, Rivard argues that Ideal obstructed the course of the litigation of the motion by withholding documents and opposing supplementation of Rivard's motion, thereby multiplying the proceedings and increasing the costs of litigating the motion. Rivard also argues that documents that it is accused of improperly withholding were not actually in its possession, but were, instead, in the possession of Dr. Hoff.

Rivard contends that a relevant consideration for Rule 11 sanctions is whether the conduct complained of is part of a pattern or practice of the party or its attorneys or is, instead, isolated conduct. Rivard points out that neither its lead attorneys nor its local counsel have ever had Rule 11 sanctions imposed against them, and that the only Rule 11 motion brought against lead counsel was denied. Rivard also compares the rarity with

which its attorneys have filed Rule 11 motions with what it asserts is the frequency with which Ideal's attorneys assert sanctions motions as a litigation strategy.

As further grounds for denying Ideal's motion for Rule 11 sanctions, Rivard contends that the Motion For Sanctions ultimately filed by Ideal is not identical to the draft motion served on Rivard on November 14, 2006. Rivard argues that it is the draft motion served upon a party, triggering the 21-day "safe harbor," that must ultimately be filed to satisfy the procedural requirements of the Rule. Rivard also contends that Ideal represented in its November 14, 2006, cover letter that, if no appropriate corrective action was taken, it was *that* motion that would be filed. Rivard argues that it did take "corrective action" by filing a supplement to its Motion For Preliminary Injunction based on Dr. Hoff's November 2006 testing, which Rivard had not known about at the time that it filed its original Motion For Preliminary Injunction. Thus, Rivard argues that the present Rule 11 motion is procedurally flawed for failure to comply with the requirements of Rule 11(c)(1)(A).

### 2. Prerequisites to Rule 11 sanctions

The court provided, above, a sketch of the provisions of Rule 11 and the requirements for imposition of sanctions pursuant to the Rule. The court finds, however, that the provisions of the Rule must be examined in more detail, in light of parties' contentions, beginning with the prerequisites to Rule 11 sanctions.

### a. The "safe harbor" requirements

Rule 11 provides that proceedings to impose sanctions may be initiated either by motion of a party or by the court *sua sponte*. FED. R. CIV. P. (c)(1). As to sanctions upon the motion of a party, the situation presented here, the Rule provides as follows:

> A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). *It shall be served*

24

*as provided in Rule 5, but shall not be filed with or presented
to the court unless, within 21 days after service of the motion
(or such other period as the court may prescribe), the
challenged paper, claim, defense, contention, allegation, or
denial is not withdrawn or appropriately corrected.* If
warranted, the court may award to the party prevailing on the
motion the reasonable expenses and attorney's fees incurred in
presenting or opposing the motion. Absent exceptional
circumstances, a law firm shall be held jointly responsible for
violations committed by its partners, associates, and
employees.

FED. R. CIV. P. 11(c)(1)(A) (emphasis added). The italicized portion of the Rule, as

quoted above, creates what the Advisory Committee and courts have called the "safe

harbor" provision:

The motion for sanctions is not, however, to be filed until at
least 21 days (or such other period as the court may set) after
being served. If, during this period, the alleged violation is
corrected, as by withdrawing (whether formally or informally)
some allegation or contention, the motion should not be filed
with the court. These provisions are intended to provide a type
of "safe harbor" against motions under Rule 11 in that a party
will not be subject to sanctions on the basis of another party's
motion unless, after receiving the motion, it refuses to
withdraw that position or to acknowledge candidly that it does
not currently have evidence to support a specified allegation.
Under the former rule, parties were sometimes reluctant to
abandon a questionable contention lest that be viewed as
evidence of a violation of Rule 11; under the revision, the
timely withdrawal of a contention will protect a party against
a motion for sanctions.

To stress the seriousness of a motion for sanctions and
to define precisely the conduct claimed to violate the rule, the
revision provides that the "safe harbor" period begins to run
only upon service of the motion. In most cases, however,
counsel should be expected to give informal notice to the other

25

> party, whether in person or by a telephone call or letter, of a
> potential violation before proceeding to prepare and serve a
> Rule 11 motion.

FED. R. CIV. P. 11, Advisory Committee Notes to 1993 Amendments; *see also Gordon v. Unifund CCR Partners*, 345 F.3d 1028 (8th Cir. 2003) (describing the provisions requiring prefiling service of the motion as creating a "safe harbor").

Not long ago, in *Gordon v. Unifund CCR Partners*, 345 F.3d 1028 (8th Cir. 2003), the Eighth Circuit Court of Appeals considered the "safe harbor" requirements of Rule 11 and the pertinent Advisory Committee Notes. The court found that the party moving for Rule 11 sanctions in that case had e-mailed the opposing party that it would request appropriate fees under Rule 11, if the opposing party did not withdraw its motion for default judgment, later sent a letter attempting to persuade the opposing party to withdraw its motion for default judgment, and then requested Rule 11 sanctions in its response to the opposing party's motion for default judgment. *Gordon*, 345 F.3d at 1029. The court found that the party moving for sanctions had not, however, "serve[d] Appellant with a copy of its proposed Rule 11 motion, providing Appellant notice to withdraw the challenged motion twenty-one days prior to [its] filing of a motion with the court," and had also failed to file the request for sanctions as a separate motion. *Id.* at 1029-30. The court found that the party moving for sanctions had "failed to comply with Rule 11's procedural requirements," because its "'request' for sanctions was not made separately from other motions or requests and [it] did not serve a prepared motion on Appellant prior to making any request to the court." *Id.* at 1030. As a result of these failings, the court found that the opposing party "was not afforded the benefit of the twenty-one day 'safe harbor' provision allowing him the opportunity to withdraw his allegedly frivolous pleading." *Id.* The court held that, while it did not wish to condone the improper tactics of the opposing

26

party, it was "unable to overlook the [movant's] procedural deficiencies," and overruled the district court's imposition of Rule 11 sanctions as an abuse of discretion. *Id.*

Unlike the situation in *Gordon*, Ideal *did* serve a draft Rule 11 motion on Rivard on November 14, 2006, much more than twenty-one days before filing its Motion For Sanctions on April 20, 2007. *Compare id.* at 1029-30 (the movant for sanctions sent the opposing party only an e-mail mentioning potential Rule 11 sanctions and a letter seeking to persuade the party to withdraw its allegedly frivolous motion, but did not send the opposing party a copy of a "proposed" or "prepared" Rule 11 motion before filing a request for sanctions). Thus, the procedural deficiency alleged here is somewhat different from the one found in *Gordon*, in that Rivard reads the provisions of Rule 11(c)(1)(A) and the pertinent Comments quoted above to contemplate that the sanctions motion ultimately filed must be *identical* to the motion served upon an opposing party at least 21 days earlier. A hypertechnical reading of both Rule 11, the Committee Notes, and *Gordon* might lead one to such a conclusion. However, the court reads both the Rule, the Notes, and *Gordon* to make clear that the *purpose* of requiring service of a "warning shot" motion more than 21 days before filing of a Rule 11 motion is to afford the opposing party "the benefit of the twenty-one day 'safe harbor' provision allowing [it] the opportunity to withdraw [its] allegedly frivolous pleading." *Gordon*, 345 F.3d at 1030. The court finds that the purpose of prefiling service of a Rule 11 motion was satisfied in this case.

First, *the grounds* for sanctions asserted in the draft Rule 11 motion served upon Rivard on November 14, 2006, are the same as the grounds asserted in the Motion For Sanctions ultimately filed. Indeed, the November 14, 2006, draft motion seeks sanctions for the filing of Rivard's false advertising counterclaim as well as the filing of the motion for preliminary injunction, *see* Plaintiff's Sanctions Exhibit 3 (alleging that the filing of the false advertising counterclaim was sanctionable in ¶¶ 9, 10, 12, 13, 14, 15), but the

27

Motion For Sanctions ultimately filed does not seek sanctions for the filing of the counterclaim, only for the filing of the preliminary injunction motion. Similarly, the November 14, 2006, draft motion sought sanctions against Meril Rivard, as well as Rivard Instruments and the defendants' attorneys, *see* Plaintiff's Sanctions Exhibit 3 (introductory paragraph moving the court for sanctions against Rivard Instruments, Meril Rivard, and their attorneys), but the Motion For Sanctions ultimately filed drops any prayer for sanctions against Meril Rivard and, instead, seeks sanctions only against Rivard Instruments, the only defendant to move for a preliminary injunction, and its counsel. *See* Motion For Sanctions (docket no. 165) (introductory paragraph seeking sanctions against Rivard Instruments and its attorneys). Second, the precise Rule 11 provisions allegedly violated have also been narrowed, because the Motion For Sanctions does not appear to assert a violation of Rule 11(b)(2) (certification that the challenged motion is warranted by existing law or non-frivolous argument for extension or reversal of existing law) as alleged in paragraph 14 of the November 14, 2006, draft motion. Third, some of the more inflammatory allegations concerning the inadequacy of the evidence supporting Rivard's Motion For Preliminary Injunction—concerning the lack of merit of a motion based on Dr. Hoff's testing, the "rigging" of Dr. Hoff's test, and allegations of Rivard's intent, *see* Plaintiff's Sanctions Exhibit 3, ¶¶ 7, 8—do not appear to be reiterated in the Rule 11 portion of the Motion For Sanctions ultimately filed.

While it is certainly true that the Motion For Sanctions is in a different format than the November 14, 2006, draft motion, in that it is a "combined" motion and brief,[4] the court finds that the additional material included in the "combined" motion and brief is the

---

[4]A combined motion and brief is not the preferred format for motions in this court. Rather, N.D. IA. L.R. 7.1(d) contemplates, if it does not expressly require, the filing of a separate brief in support of a motion.

fuller argument that one would expect to find in a separate brief in support of a Rule 11 sanctions motion. Rule 11 says nothing about requiring service of the *brief* in support of a Rule 11 motion to trigger the twenty-one day "safe harbor." *See* FED. R. CIV. P. 11(c)(1)(A) ("It," meaning the motion, "shall be served . . . , but shall not be filed" until expiration of the 21-day "safe harbor" period). Thus, the court concludes that supplementation of the draft Rule 11 motion with a brief or supporting argument when the Rule 11 motion is ultimately filed does not mean that the motion ultimately filed is improper.

Finally, *the relief* pursuant to Rule 11 sought in Ideal's Motion For Sanctions, as ultimately filed, is actually narrower than the relief pursuant to Rule 11 set out in the draft motion served on Rivard on November 14, 2006. The November 14, 2006, draft motion sought adjudication that the filing of *both* the amended counterclaim for false advertising and the motion for preliminary injunction violated the provisions of Rule 11. *See* Plaintiff's Sanctions Exhibit 1 (Prayer, ¶¶ (A) and (B)). The Motion For Sanctions ultimately filed, however, seeks only adjudication that the filing of the motion for preliminary injunction violated Rule 11. *See* Plaintiff's Motion For Sanctions (docket no. 165), Prayer, ¶ (A). Both the November 14, 2006, draft motion and the Motion For Sanctions seek an order requiring Rivard and or its attorneys to pay Ideal the costs and attorneys fees incurred by Ideal as a result of the filing of the motion for preliminary injunction pursuant to Rule 11, although the November 14, 2006, draft motion also seeks fees and costs for the filing of the false advertising counterclaim. *Compare* Plaintiff's Sanctions Exhibit 1 (Prayer, ¶ (F)), with Plaintiff's Motion For Sanctions, Prayer, ¶ (D). The addition to the Prayer of the Motion For Sanctions of a request for an order granting Ideal thirty days after the granting of its motion to file its claim for attorneys fees and costs

incurred in connection with the Motion For Preliminary Injunction and granting Rivard fourteen days thereafter to respond clearly does not prejudice Rivard.

Thus, unlike the situation in *Gordon*, the court finds that Rivard was "afforded the benefit of the twenty-one day 'safe harbor' provision allowing [it] the opportunity to withdraw [its] allegedly frivolous pleading," *id.* at 1030, even if the Rule 11 motion ultimately filed was not identical to the draft motion served on Rivard more than twenty-one days earlier. Rivard was apprised of the grounds for Ideal's Rule 11 motion and expressly advised of Ideal's demand that Rivard withdraw the allegedly unwarranted motion more than twenty-one days before Ideal filed its actual Rule 11 motion.

### b. *Right to be heard*

Although Rule 11(c)(1)(A) otherwise sets out the procedural requirements for imposition of sanctions upon the motion of an opposing party, it does not require a procedure to "show cause" why sanctions should not be imposed as it does when the court seeks to impose sanctions on its own initiative. *See* FED. R. CIV. P. 11(c)(1)(B). Nevertheless, assuming that similar due process concerns are implicated when Rule 11 sanctions are or may be imposed upon the motion of a party as would arise if sanctions were to be imposed by the court *sua sponte*, the question for due process purposes is whether the party facing sanctions has a real and full opportunity to explain its questionable conduct before sanctions are imposed. *Coonts v. Potts*, 316 F.3d 745, 753 (8th Cir. 2003). In this case, Rivard was fully informed of the conduct that Ideal believes is sanctionable, Rivard has had and has taken advantage of a full and fair opportunity to brief an explanation for its questionable conduct, and Rivard has been heard in oral arguments. Therefore, any due process concerns in this case have been satisfied.

### c. *Parties potentially subject to sanctions*

The allegedly unreasonable Motion For Preliminary Injunction on which Ideal's Motion For Sanctions is based was filed only by Rivard Instruments; Meril Rivard was not identified as a movant. *See* Rivard's Motion For Preliminary Injunction on October 30, 2006 (docket no. 85). The court notes that Ideal's November 14, 2006, draft motion for sanctions indicated an intention to seek sanctions against Meril Rivard, as well as Rivard Instruments and the defendants' attorneys. *See* Plaintiff's Sanctions Exhibit 3. Ideal's Motion For Sanctions, as ultimately filed, is also captioned as a motion for sanctions "against defendants and their attorneys," but actually seeks sanctions only against "Defendant Rivard Instruments, Inc. ('Rivard') and its attorneys." *See* Motion For Sanctions (docket no. 165), 1. Rule 11(c) authorizes sanctions "upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." FED. R. CIV. P. 11(c). Here, in the absence of any allegation that Meril Rivard is "responsible for the violation," only defendant Rivard Instruments and its attorneys are potentially subject to sanctions, because only the party that filed the questionable motion and its attorneys can be construed to "have violated subdivision (b)." *Id.*

### 3. *Sanctionable conduct under Rule 11*

Preliminary matters aside, the court turns to the question of whether any conduct sanctionable under Rule 11 occurred in this case. When considering whether or not to impose sanctions for an alleged violation of Rule 11, "'[t]he district court's task is to ascertain whether the attorney met the objective reasonableness standard.'" *Norsyn, Inc.*, 351 F.3d at 831 (quoting *Black Hills Inst. of Geological Research v. South Dakota Sch. of Mines & Tech.*, 12 F.3d 737, 745 (8th Cir. 1993)). Determining whether or not to impose Rule 11 sanctions for unreasonable action necessarily requires an examination of the underlying factual and legal claims, as well as the appropriateness of the sanction to

be imposed. *Cf. MHC Inv. Co. v. Racom Corp.*, 323 F.3d 620, 623 (8th Cir. 2003) (stating this requirement to review the district court's imposition of Rule 11 sanctions). This is so, because "[d]eterminations under Rule 11 often involve 'fact-intensive, close calls.'" *Clark*, 460 F.3d at 1010 (quoting *Cooter & Gell*, 496 U.S. at 404). Moreover, when imposing sanctions, Rule 11 requires the court to "describe the conduct determined to constitute a violation of this rule and explain the basis for the sanction imposed." FED. R. CIV. P. 11(c)(3).

Rule 11 provides, in pertinent part, as follows:

>     **(b) Representations to Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
>         **(1)** it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
>         **(2)** the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
>         **(3)** the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
>         **(4)** the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
>
>     **(c) Sanctions.** If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions

32

> stated below, impose an appropriate sanction upon the
> attorneys, law firms, or parties that have violated subdivision
> (b) or are responsible for the violation.

FED. R. CIV. P. 11(b)-(c). In this case, Ideal expressly asserts that Rivard's Motion For Preliminary Injunction violated subsections (b)(1) and (b)(3). The court will consider these alleged violations, below. However, the court will consider whether these provisions have been violated in reverse order, for example, because inferences of improper purpose and an attorney's state of mind, within the meaning of subsection (b)(1), "must necessarily be based on circumstantial evidence and inferences drawn therefrom." *Clark*, 460 F.3d at 1011. In this court's view, a clear violation of subsection (b)(3) might provide circumstantial evidence and inferences of improper purpose establishing a violation of subsection (b)(1), as well.

### a. *Lack of evidentiary support*

*i.* *Applicable standards*. A violation of Rule 11 occurs, *inter alia*, when a pleading contains allegations or factual contentions that lack evidentiary support. FED. R. CIV. P. 11(b)(3); *see also Clark*, 460 F.3d at 1008 (so characterizing a violation of subsection (b)(3)). Thus, a party may properly be sanctioned if its claim or motion "did not have any basis in fact"; if the party failed to present any facts supporting the claim or motion; or if the claim or motion was based on immaterial factual allegations. *MHC Inv. Co.*, 323 F.3d at 625 (the district court did not abuse its discretion in sanctioning a law firm for asserting fraud and fraudulent inducement claims that did not have any basis in fact, failing to present any facts supporting a claim of breach of fiduciary duty, and relying on immaterial facts to challenge the validity of agreements); *Coonts*, 316 F.3d at 753-54 (sanctions were appropriate where a party's claim was not warranted under the facts of the case, and the district court explained the fallacies in contentions that the claims were supported by the evidence).

33

Similarly, "Rule 11 requires that an attorney conduct a reasonable inquiry of the factual and legal basis for a claim before filing." *Coonts*, 316 F.3d at 753; *Chandler v. Norwest Bank Minnesota, Nat'l Ass'n*, 137 F.3d 1053, 1057 (8th Cir. 1998) (sanctions were appropriate, even where the plaintiffs may arguably have had a reasonable belief that their claim had or was likely to have evidentiary support, but counsel could not have conducted a reasonable inquiry necessary to support the plaintiffs' claim, where the plaintiffs ultimately were unable to produce a scintilla of evidence supporting their claim); *Monterey Dev. Corp. v. Lawyer's Title Ins. Corp.*, 4 F.3d 605, 610 (8th Cir. 1993) (sanctions were appropriate where "[a] reasonable investigation would have shown counsel" that the party was contradicting a factual stipulation and manipulating the judicial process). The Eighth Circuit Court of Appeals has explained, "Whether the attorney's inquiry is reasonable may depend on factors such as whether counsel had to rely on a client for factual information, or whether the attorney depended on forwarding counsel or another member of the bar." *Id.* (citing FED. R. CIV. P. 11, Notes of Advisory Committee, 1983 Amendment and 1993 Amendment).

The duty of a party to assess the viability of a claim is not measured solely at the time that the claim was filed, but is a continuing one. Therefore, a party may be sanctioned for persisting with a claim or motion once it becomes apparent that it lacks evidentiary support. *See* FED. R. CIV. P. 11, Advisory Committee Notes to 1993 Amendment (the rule "emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable" and "a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit").

34

Ultimately, the court must determine "'whether a reasonable and competent attorney would believe in the merit of an argument.'" *Coonts*, 316 F.3d at 753 (quoting *Miller v. Bittner*, 985 F.2d 935, 939 (8th Cir. 1993)).

*ii.*  ***Reasonableness of reliance on Dr. Hoff's testing***.  In this case, it is just barely possible that Rivard and its attorneys could have believed that their original Motion For Preliminary Injunction had merit, on the basis that their expert had found from certain testing that 55% of Ideal's D3 needles had failed a "detectability" test.  Indeed, this court observed in its ruling on Rivard's Motion For Preliminary Injunction that a 55% failure rate for what are supposed to be "detectable" needles, as found in Dr. Hoff's October 2006 tests, would be "frightening."  *Ideal Instruments III*, 479 F. Supp. 2d at 977. Nevertheless, it is clear that Rivard and its counsel then shirked their responsibilities to conduct a reasonable investigation of or inquiry about Dr. Hoff's October 2006 test results before filing their Motion For Preliminary Injunction.  *See Coonts*, 316 F.3d at 753 (an attorney must conduct a reasonable inquiry of the factual and legal basis for a claim before filing); *Chandler*, 137 F.3d at 1057 (even where a party might have reasonably believed that it had or would have evidentiary support for a claim, sanctions were appropriate where counsel did not conduct a reasonable inquiry necessary to support the claim).  Any reasonable inquiry would have demonstrated the obvious flaws in Dr. Hoff's October 2006 testing that the court identified in its ruling denying the motion for preliminary injunction, specifically, that those tests "ha[d] no probative value whatsoever concerning the 'detectability' of Ideal's D3 needles within the meaning of the livestock and meat processing industries owing to the flawed procedures that bore no relationship to industry conditions or the conditions of prior tests commissioned by the [National Pork Board (NPB)]."  *Ideal Instruments III*, 479 F. Supp. 2d at 977.  Under the circumstances of this case, it is simply no excuse for Rivard and its counsel to assert that they relied on an

35

"expert" for the basis for their original preliminary injunction motion, precisely because the flaws in the "expert's" evidence should have been so readily apparent on any reasonable examination or inquiry. *But cf. Coonts*, 316 F.3d at 753 (whether an attorney's inquiry is reasonable may depend upon whether counsel has to rely on others for factual information).

Moreover, Rivard and its counsel shirked their responsibility to conduct a continuing inquiry into the viability of their grounds for a preliminary injunction based on Dr. Hoff's testing, even and especially after Dr. Hoff conducted further testing in November 2006 and was subjected to various depositions demonstrating the faultiness of his October 2006 test results. *See* FED. R. CIV. P. 11, Advisory Committee Notes to 1993 Amendments (the responsibility to investigate a claim continues, and the assessment of the viability of the claim is not limited to when it is first asserted). No reasonable attorney could have believed that Dr. Hoff's November 2006 testing demonstrated that Ideal's D3 needles were not "detectable," and certainly, no reasonable attorney could have believed that is what those tests showed, after Dr. Hoff admitted in his second deposition on December 9, 2006, that, after his November 2006 testing, "the evidence would support" that D3 needles are detectable. *See Ideal Instruments III*, 479 F. Supp. 2d at 978.

Thus, the court concludes that Rivard's attorneys' reliance on Dr. Hoff's testing as the basis for the sweeping preliminary injunctive relief they sought simply was not "objectively reasonable," *see Norsyn, Inc.*, 351 F.3d at 831 ("'[T]he district court's task is to ascertain whether the attorney met the objective reasonableness standard.'") (quoting *Black Hills Inst. of Geological Research*, 12 F.3d at 745), because no "'reasonable and competent attorney would [have] believe[d] in the merit of an argument'" based on such evidence. *Coonts*, 316 F.3d at 753 (quoting *Miller*, 985 F.2d at 939). The court also does not believe that Rivard's reliance on such evidence was "objectively reasonable," because

Rivard was sufficiently sophisticated in the manufacture and testing of "detectable" needles to recognize the flaws in Dr. Hoff's evidence, even without an intermediary attorney to advise Rivard of the legal implications of the evidence. *Compare Chandler*, 137 F.3d at 1057 (the plaintiffs may arguably have had a reasonable belief that their claim had merit or was likely to have evidentiary support, but counsel could not have conducted a reasonable inquiry necessary to support the plaintiffs' claim, where the plaintiffs were unable to produce a scintilla of evidence supporting their claim). The record demonstrates an unwarranted eagerness by Rivard and its attorneys to seize upon flimsy evidence, the insufficiency of which should have been obvious, as the basis for a demand for sweeping injunctive relief that would have devastated Ideal's detectable needle business. Such conduct is sanctionable.

      *iii.*    *Reasonableness of reliance on metallurgical testing*. Rivard nevertheless argues that it reasonably relied on its metallurgical expert's testing results, showing that some of Ideal's D3 "detectable" needles were made of the same type 304 stainless steel that Ideal had asserted was not sufficiently detectable. Rivard asserts that the metallurgical evidence was intended to support and explain Dr. Hoff's results, but was not intended to be an independent ground for preliminary injunctive relief. The court is considerably more sympathetic to Rivard's contentions that the metallurgical evidence could reasonably have been believed to support a claim that Ideal's D3 needles were not "detectable," because some or all of such needles were made from the "wrong steel." Unlike the copious evidence undermining Dr. Hoff's late 2006 tests and conclusions from those tests, the preliminary injunction record does not contain any evidence suggesting that the metallurgical tests were so faulty that no party or attorney could reasonably have relied upon them or that further inquiry could or should have demonstrated that the metallurgical evidence was so suspect that it could not be relied upon. This is true, even in light of

37

Ideal's evidence that Dr. Hoff admitted in one of his depositions that needles made from type 304 stainless steel are detectable, and metallurgy tests that revealed that Rivard also makes or made some of its "detectable" needles from type 304 stainless steel. *See Ideal Instruments III*, 479 F. Supp. 2d at 981.

Indeed, Rivard is correct that the primary reason that the court did not find that preliminary injunctive relief was required on the basis of the metallurgical evidence that Rivard presented was *not* that the evidence was insufficient, but that Ideal had taken appropriate steps to address the problem revealed by the metallurgical testing. Specifically, the court found,

> Ideal has also submitted the affidavit of Terri Morrical, a Vice President of Ideal's parent company, Neogen, averring that, when Ideal learned from Rivard's tests that some of Ideal's D3 needles are made from type 304 stainless steel, not a duplex steel as required by the specifications to Ideal's manufacturer, out of an abundance of caution, she quarantined all remaining D3 needles from affected lots, and none of those quarantined needles have ever been sold or distributed. Plaintiff's Exhibit 34. Thus, there is no convincing evidence that the use of the "wrong" stainless steel alloy in some of Ideal's D3 needles resulted in needles that were not "detectable" or that were a danger to the public.

*Ideal Instruments III*, 479 F. Supp. 2d at 981. The court also found that Ideal's other corrective measures to ensure that its "detectable" needles were made according to its specifications obviated the need for any preliminary injunction:

> The court finds that, even if Ideal has, in the past, relied substantially or entirely on the metallurgy of its needles to ensure the detectability of its needles, the evidence shows that Ideal does not now do so. Rather, as mentioned above, the court finds that Toku-E, Ideal's Chinese manufacturer, tests every lot of needles using a flatbed metal detector to ensure detectability before shipping the needles to Ideal, and every

38

test has confirmed the detectability of the needles. Plaintiff's Exhibit 26, Pan Declaration ¶ 6. Moreover, as also mentioned above, the court finds that Ideal has now purchased a Safeline Powerphase Plus metal detector for its Lansing, Michigan, facility, which it uses to test every lot of D3 needles that it receives from Toku-E. Plaintiff's Exhibit 14, Herbert Declaration, ¶ 20. In addition, Ideal now regularly sends out D3 needles from Toku-E to Chicago Spectro for metallurgy testing to ensure that its D3 needles are made from duplex stainless steel. *Id.* Also, as mentioned above, despite the lack of routine metallurgical testing until recently, there is no convincing evidence that D3 needles have been "undetectable," not least because there have been no widespread or repeated complaints of "undetectability" in the field and no evidence of a single instance in which a D3 needle passed entirely through the livestock production and meat processing system to a consumer. Under the circumstances, the court finds that, at least now, Ideal conducts adequate testing to ensure that its D3 needles are, indeed, "detectable," without relying exclusively on the metallurgy of its needles, which could be subject to variation owing to manufacturing processes or substitution of the "wrong" alloys, and there is no convincing evidence that its prior failure to conduct such testing resulted in a danger to the public from "undetectable" needles entering the stream of commerce.

*Ideal Instruments III*, 479 F. Supp. 2d at 980. Thus, that part of Rivard's Motion For Preliminary Injunction that relied on metallurgical evidence was not so unreasonable as to warrant sanctions.

In its preliminary injunction ruling, however, the court did reject Rivard's argument that the metallurgical evidence explained Dr. Hoff's test results:

At the hearing, Rivard attempted to correlate metallurgical tests with Dr. Hoff's tests in October and November 2006 to demonstrate that D3 needles that produced poor signals in metal detector tests were made from type 304

39

> stainless steel. Even if there is such a correlation, however, for the reasons stated above, Dr. Hoff's October 2006 tests have no probative value on "detectability," so a significant point of reference is lacking.

*Ideal Instruments III*, 479 F. Supp. 2d at 981. Similarly, the court now rejects Rivard's contention that the metallurgical evidence, only submitted and apparently discovered well after Rivard filed its original motion for preliminary injunction based solely on Dr. Hoff's testing, somehow demonstrates that Rivard's original reliance on Dr. Hoff's testing was not so unreasonable as to be sanctionable. At the time that Rivard filed its original motion for preliminary injunction and up until the time that it finally supplemented its motion with metallurgical evidence, reliance on Dr. Hoff's tests was unreasonable and any reasonable inquiry until that time would have demonstrated the unreasonableness of reliance on Dr. Hoff's tests. Even after the metallurgical evidence seemed to confirm or explain some of Dr. Hoff's test results, however, the unreliability and evidentiary inadequacy of Dr. Hoff's tests themselves remained. Thus, the metallurgical testing, upon which Rivard could have reasonably relied, did not "purge" the glaring unreasonableness of Rivard's original or continued reliance on Dr. Hoff's testing.

### b. *Improper purpose*

*i. Applicable standards*. Ideal also seeks sanctions for a violation of Rule 11(b)(1), asserting that Rivard's Motion For Preliminary Injunction was filed for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation. *See Clark*, 460 F.3d at 1008 (so characterizing a violation of FED. R. CIV. P. 11(b)(1)). As the court observed above, inferences of improper purpose and an attorney's state of mind, within the meaning of subsection (b)(1), "must necessarily be based on circumstantial evidence and inferences drawn therefrom." *Id*. at 1011. Also, determination of whether litigation conduct is for an improper purpose sanctionable under

Rule 11 requires the court to be sensitive to two areas: (1) "the idea that on occasion attorneys engage in litigation tactics that are unjustifiable within the broad bounds of our adversarial system, and that our system does not tolerate such tactics," and (2) that "Rule 11 also recognizes the adversarial nature of a system where attorneys zealously represent their clients." *MHC Inv. Co. v. Racom Corp.*, 323 F.3d 620, 626-27 (8th Cir. 2003).

In *Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004 (8th Cir. 2006), the Eighth Circuit Court of Appeals affirmed the district court's findings that portions of a challenged pleading "'were created *for the sole purpose* of causing unnecessary delay and a needless increase in the costs of litigation,'" and that a pleading by that party "represented 'a form [of] litigation by attrition, wherein *the practitioner's intent* was to force the opposition either to yield to its position or be crushed under a great weight of misstated factual assertions and drowned in a sea of bombast.'" *Clark*, 460 F.3d at 1010-11 (emphasis in the original) (quoting the district court's decision). The appellate court found no abuse of discretion in these findings, where the document upon which sanctions were based was overlong, and contained "unsupported attempts to controvert facts (including misstatements and mischaracterizations of the record), failures to provide citations to the record, improper use of cumbersome cross-references, and inappropriate inclusion of legal argument in a purported listing of disputed material facts," all making the pleading "unduly burdensome." *Id.* at 1010. Similarly, in *MHC Investment Co. v. Racom Corp.*, 323 F.3d 620 (8th Cir. 2003), the Eighth Circuit Court of Appeals concluded that sanctions were appropriate for a defendant's use of claims and defenses for the purpose of delaying payment of money owed to the plaintiff where the claims and defenses were unsupported by adequate evidence, the defendant and its counsel could not demonstrate any basis for a belief in the validity of the claims and defenses, and the record established that the

41

conduct was not a single incident, but a pattern of persisting in the claims over the course of two separate resistances to summary judgment motions and attempts to extend the proceedings without offering valid reasons to do so. *MHC Inv. Co.*, 323 F.3d at 627.

　　*ii.* ***Inferences of improper purposes***. The court observed, above, that the record here demonstrates an unwarranted eagerness by Rivard and its attorneys to seize upon flimsy evidence, Dr. Hoff's obviously invalid and unreliable test results, as the basis for a demand for sweeping injunctive relief that would have devastated Ideal's detectable needle business, and that Rivard and its attorneys persisted in relying on Dr. Hoff's tests after any reasonable inquiry, and depositions of Dr. Hoff, would have revealed the unreliability of those test results. Such conduct gives rise to inferences of intent to harass or delay the litigation of the underlying patent dispute. *See Clark*, 460 F.3d at 1008 (evidence of improper purpose depends upon inferences drawn from circumstantial evidence); *id.* at 1010-11 (finding inferences of improper purposes from unsupported allegations and cumbersome pleadings); *MHC Inv. Co.*, 323 F.3d at 627 (finding inferences of improper purpose where claims and defenses were unsupported by adequate evidence). Moreover, Rivard's repeated amendments of its original request for "expedited" preliminary injunctive relief constituted "moving the goal posts" and delayed disposition of the motion for months. As such, that conduct gives rise to an inference of intent to delay and complicate the proceedings. *MHC Inv. Co.*, 323 F.3d at 627 (inferences of improper purpose arose from a pattern of persistent resistance based on insufficient evidence and attempts to extend proceedings without valid reasons).

　　While Rivard's and its attorneys' conduct could, perhaps, be characterized as an attempt to place their motion for a preliminary injunction on valid grounds, it was plain that the original motion lacked such valid grounds. Thus, the reasonable and appropriate course would have been to withdraw that motion until valid support for the preliminary

injunctive relief that Rivard was seeking could be assembled. Indeed, had Rivard's Motion For Preliminary Injunction been presented in its final, complete form, instead of episodically, the court would be unlikely to impose any sanctions at all, notwithstanding the court's conclusion that substantial portions of the evidence supporting the motion were of little or no probative value. Episodic amendment of the motion simply delayed the proceedings and unnecessarily increased the costs to the parties of litigating the motion. Inevitably, litigation of the preliminary injunction motion on such an initially untenable basis and in such an episodic manner delayed proceedings and distracted the parties and the court from the orderly disposition of this case. Rivard's and its attorneys' conduct was not simply a matter of "zealous[] represent[ation]," but an example of "litigation tactics that are unjustifiable within the broad bounds of our adversarial system," and which "our system does not tolerate." *MHC Inv. Co.*, 323 F.3d at 626-27 (Rule 11 requires sensitivity to zealous representation, on the one hand, and the idea that occasionally attorneys engage in unjustifiable litigation tactics, on the other).

Thus, the court concludes that Rivard's and its attorneys' conduct is sanctionable pursuant to Rule 11(b)(1), as well as pursuant to Rule 11(b)(3).

### 4. *The appropriate sanctions*

#### a. *Applicable standards*

"The court has broad discretion in the choice of sanctions" pursuant to Rule 11. *See Coonts*, 316 F.3d at 753 (citing *Cooter & Gell*, 496 U.S. at 384). Ideal seeks sanctions in the form of payment of all or some of its reasonable attorney fees for litigating Rivard's unwarranted Motion For Preliminary Injunction through all its permutations and amendments. Rule 11 expressly provides that, if the court determines, upon a party's motion, that sanctions are warranted for an opposing party's unwarranted filing of a substantive motion, "the court may award to the party prevailing on the [substantive]

43

motion the reasonable expenses and attorney's fees incurred in presenting or opposing the
[substantive] motion," and "[a]bsent exceptional circumstances, a law firm shall be held
jointly responsible for violations committed by its partners, associates, and employees."
FED. R. CIV. P. 11(c)(1)(A). Rule 11 provides, further,

> Subject to the limitations in subparagraphs (A) and (B), the
> sanction may consist of, or include, directives of a
> nonmonetary nature, an order to pay a penalty into court, or,
> if imposed on motion and warranted for effective deterrence,
> an order directing payment to the movant of some or all of the
> reasonable attorneys' fees and other expenses incurred as a
> direct result of the violation.

FED. R. CIV. P. 11(c)(2). Thus, Rule 11 expressly "places within the district court's
arsenal the ability to award reasonable expenses and attorney fees," but *only* upon the
request of the opposing party, and *only* if warranted for effective deterrence. *Norsyn, Inc.*,
351 F.3d at 831 (citing FED. R. CIV. P. 11(c)(2), which permits an award of all or some
of the attorney fees and costs incurred as a direct result of the violation, "if imposed on
motion and warranted for effective deterrence"). On the other hand, if the other party
made no request for attorney fees, that party is not entitled to such an award. *Norsyn,
Inc.*, 351 F.3d at 831.[5] Here, however, Ideal has requested an award of reasonable
attorney fees for sanctionable conduct by Rivard and its attorneys.

---

[5]The Eighth Circuit Court of Appeals has held that "[i]t is not permissible to award
attorneys' fees under Rule 11 when the sanctions are imposed sua sponte, but an award of
attorneys' fees is permissible under a court's inherent powers as long as the person being
sanctioned has demonstrated bad faith." *Willhite*, 459 F.3d at 870 (citations omitted). The
court is not imposing any sanctions *sua sponte*, but is considering doing so upon Ideal's
motion. Thus, recourse to the court's inherent authority is not required to justify an award
of attorneys fees. Rule 11 also places certain limitations on monetary sanctions, *see* FED.
R. CIV. P. 11(c)(2), but the circumstances giving rise to such limitations also are not at
issue here.

44

Whatever sanctions are imposed, Rule 11 provides that the sanctions "shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." FED. R. CIV. P. 11(c)(2); *Clark*, 460 F.3d at 1011 (finding that a sanction of $1,000 was reasonable and consistent with the principle that sanctions should be limited as stated in Rule 11(c)(2)). Just as a court is required to explain the basis for sanctions, a court is required to explain the basis for the amount of any sanctions imposed. *See Plaintiffs' Baycol Steering Committee*, 419 F.3d at 809 (observing that a monetary sanction as large as $50,000 required an explanation of the basis for the amount of the sanction, and remanding for such explanation); *and compare MHC Inv. Co.*, 323 F.3d at 628 (the district court's detailed explanation of its reasons for imposing $25,000 in sanctions demonstrated that there was no abuse of discretion in imposing sanctions in that amount). Moreover, the court must explain why sanctions are imposed upon a party, the party's counsel, or both. *See Tenkku v. Normandy Bank*, 348 F.3d 737, 744 (8th Cir. 2003) (the district court erred in imposing sanctions on both the party and her counsel where there was no showing that the party had violated Rule 11).

### b. The sanction warranted here

Under the circumstances presented here, in determining what sanction is sufficient, but properly limited, "to deter repetition of such conduct or comparable conduct by others similarly situated," FED. R. CIV. P. 11(c)(2), the court determines that an award of *part* of the reasonable attorneys fees and expenses that Ideal has incurred in litigating Rivard's Motion For Preliminary Injunction is warranted. FED. R. CIV. P. 11(c)(1)(A) ("[T]he court may award to the party prevailing on the [substantive] motion the reasonable expenses and attorney's fees incurred in presenting or opposing the [substantive] motion."); FED. R. CIV. P. 11(c)(2) (where sanctions are "imposed on motion and warranted for effective deterrence," the court is authorized to enter an order "directing

45

payment to the movant [for sanctions] of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation"); *Norsyn, Inc.*, 351 F.3d at 831 (the court may award attorneys fees to the opposing party if the opposing party has sought such an award). Only *part* of Ideal's attorneys fees and expenses should be awarded as an appropriate sanction, because only *part* of the attorneys fees and expenses that Ideal has incurred in litigating Rivard's Motion For Preliminary Injunction are the "direct result" of Rule 11 violations. FED. R. CIV. P. 11(c)(2) (authorizing an award of attorney fees and expenses that are "a direct result of the violation"). Specifically, the court's conclusion that Rivard and its attorneys violated Rule 11(b)(1) and (b)(3) is premised on their reliance on Dr. Hoff's obviously invalid and unreliable testing in October and November 2006. On the other hand, the court found, above, that Rivard and its attorneys *did not* violate Rule 11 by relying on the report of their metallurgical expert as a ground for seeking a preliminary injunction. Reliance on adequate evidence, however, did not come until Rivard's February 2, 2007, supplement (docket no. 140), and thereafter, Rivard and its attorneys continued to rely, in significant part, on Dr. Hoff's obviously invalid and unreliable October and November 2006 testing. Therefore, the court concludes that an appropriate sanction is an award of *all* of Ideal's reasonable attorneys fees and expenses incurred in litigating Rivard's Motion For Preliminary Injunction, including challenges to Rivard's motions to supplement its Motion For Preliminary Injunction and underlying discovery disputes, *until February 2, 2007*, and *half* of Ideal's reasonable attorneys fees and expenses incurred thereafter in litigating Rivard's Motion For Preliminary Injunction. Such a sanction is sufficient to deter like conduct by Rivard, its attorneys, or others similarly situated, so that the court finds it unnecessary to impose other directives of a nonmonetary nature, or to order the payment of any penalty into court. *See* FED. R. CIV. P. 11(c)(2) (authorizing such further sanctions).

46

Finally, the court deems it appropriate to impose this sanction *jointly* upon both Rivard and its attorneys. *See Tenkku*, 348 F.3d at 744 (the court should explain why sanctions are imposed upon a party, the party's counsel, or both, and the district court errs in imposing sanctions on both the party and the party's counsel absent a showing that the party also violated Rule 11). For the reasons explained above, both Rivard and its attorneys are responsible for the violations at issue here, where Rivard possessed the sophistication in the manufacture and testing of "detectable" needles to recognize the flaws in Dr. Hoff's evidence, and the attorneys were responsible for recognizing or investigating the legal and evidentiary significance of that obviously flawed evidence. The court finds no exceptional circumstances relieving Rivard's law firm of joint responsibility for violations committed by the partners, associates, and employees directly involved in this case. *See* FED. R. CIV. P. 11(c)(1)(A) ("Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees."). Nor does the court find any reason to excuse Rivard's local counsel from joint responsibility for this sanction. "The text of the rule does not provide a safe harbor for lawyers who rely on the representations of outside counsel." *Val-Land Farms, Inc. v. Third Nat'l Bank in Knoxville*, 937 F.2d 1110, 1118 (6th Cir. 1991). As the Supreme Court explained, "[T]he purpose of Rule 11 as a whole is to bring home to the individual signer his personal nondelegable responsibility." *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 126 (1989); *see also Val-Land Farms, Inc.*, 937 F.2d at 1118 (quoting *Pavelic & LeFlore*). "If [attorneys], acting as local counsel, signed [a party's pleading] relying entirely on the representations of [outside counsel], so much the worse for them." *Val-Land Farms, Inc.*, 937 F.2d at 1118.[6]

---

[6]Owing to electronic filing, no attorney physically signed any of the pertinent
(continued...)

Therefore, that part of Ideal's April 20, 2007, Motion For Sanctions seeking sanctions pursuant to Rule 11 will be granted as detailed above. Ideal will be directed to submit a claim for fees and expenses, in compliance with N.D. IA. L.R. 54.2. Such claim shall be for *all* fees and expenses incurred in litigating Rivard's Motion For Preliminary Injunction. The court will make the adjustments to the fee award described above, in addition to the court's evaluation of the reasonableness of the fees and expenses claimed. Rivard will, of course, be given the opportunity to challenge the reasonableness of the fees and expenses claimed and their relation to the litigation of Rivard's Motion For Preliminary Injunction. At oral arguments on reasonableness of the fee claim and adjustments to the fee award, the court will also entertain arguments on the appropriate percentages of the fee award to be allocated against the corporate defendant, outside counsel and their law firm, and local counsel and their law firm. Again, in the court's view, each such entity is responsible for at least some share of the attorney fees awarded as a Rule 11 sanction in this case, and it is for the court to determine what those shares shall be.

### D.  Other Sanctions

In addition to sanctions pursuant to Rule 11, Ideal seeks sanctions pursuant to 28 U.S.C. § 1927 and the court's inherent power. The court takes no position on whether

---

[6](…continued)
pleadings, and each of the pertinent pleadings in support of Rivard's motion for preliminary injunction indicates only an outside attorney's name as the filing attorney. Nevertheless, each such filing bears the names of all of the outside and local attorneys who have appeared for Rivard. Thus, to conclude that local counsel has no responsibility, because local counsel did not physically sign any of the pertinent pleadings would be a hypertechnical and nonsensical reading of Rule 11.

sanctions similar or in addition to those imposed above pursuant to Rule 11 would be warranted pursuant to § 1927 or the court's inherent authority under the standards for such sanctions summarized above in Section II.B. above. Instead, the court finds that the sanctions imposed pursuant to Rule 11 are sufficient to redress and deter any sanctionable conduct. Therefore, the parts of Ideal's April 20, 2007, Motion For Sanctions seeking sanctions pursuant to 28 U.S.C. § 1927 or the court's inherent authority will be denied.

## III.  CONCLUSION

The court cannot adequately express its disappointment that it has been necessary to impose sanctions upon any party or attorney appearing before it. Nevertheless, with due sensitivity to two areas of concern under Rule 11, "the adversarial nature of the system where attorneys zealously represent their clients" and "the idea that on occasion attorneys engage in litigation tactics that are unjustifiable within the broad bounds of our adversarial system, and that our system does not tolerate such tactics," *MHC Inv. Co.*, 323 F.3d at 626-27, the court finds that Rule 11 sanctions are warranted in this case. Because the court is imposing sanctions pursuant to Rule 11, however, the court finds it unnecessary to consider whether the same or additional sanctions might be imposed pursuant to 28 U.S.C. § 1927 or the court's inherent power.

THEREFORE,

1.      Ideal's April 20, 2007, Combined Motion And Brief In Support Of Motion For Sanctions Against Defendants And Their Attorneys Pursuant To F.R. Civ. P. 11, 28 U.S.C. § 1927, and/or This Court's Inherent Authority (Ideal's Motion For Sanctions) (docket no. 165) is **granted in part and denied in part**, as follows:

a.      The motion is **granted** to the extent that the court imposes sanctions pursuant to Rule 11 consisting of an award of *all* of Ideal's reasonable attorneys

49

fees and expenses incurred in litigating Rivard's Motion For Preliminary Injunction, including challenges to Rivard's motions to supplement its Motion For Preliminary Injunction and underlying discovery disputes, *until February 2, 2007*, and *half* of Ideal's reasonable attorneys fees and expenses incurred thereafter in litigating Rivard's Motion For Preliminary Injunction. Such award is against Rivard Instruments, Inc., and its attorneys, including local counsel, jointly.

      b.    The motion is **otherwise denied**.

2.    **Not later than August 10, 2007,** Ideal shall submit a claim for fees and expenses, in compliance with N.D. IA. L.R. 54.2, for *all* fees and expenses incurred in litigating Rivard's Motion For Preliminary Injunction. The court will make the adjustments to the award of fees and expenses described above, in addition to the court's evaluation of the reasonableness of the claim. Rivard and its attorneys shall have **to and including August 24, 2007,** to file any response to Ideal's claim for fees and expenses challenging the reasonableness of the fees and expenses claimed or their relationship to litigation of Rivard's Motion For Preliminary Injunction.

      **IT IS SO ORDERED.**

      **DATED** this 3rd day of July, 2007.

                                          _____

                                          MARK W. BENNETT
                                          U. S. DISTRICT COURT JUDGE
                                          NORTHERN DISTRICT OF IOWA

Case 3:05-cv-03079-MWB   Document 197   Filed 07/03/07   Page 50 of 50